UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x

CHRISTINE ASIA CO., LTD., et al.,

      Plaintiffs,

    -against-

ALIBABA GROUP HOLDING LIMITED, et al.,

      Defendants.

_____ x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/27/16

No. 15-md-02631 (CM)

## AMENDED MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

McMahon, C.J.:

The issue raised by this garden-variety securities fraud complaint is simple: is an offering document that fully discloses all substantive investment risks materially misleading if it fails to disclose that a government agency, in a country very different than ours, met with the issuer to underscore the issuer's obligation to ameliorate those risks?

Plaintiffs assert that the Chinese e-commerce giant Alibaba Group Holding Limited ("Alibaba" or "the Company") and several of its officers and directors knowingly or recklessly concealed that the Company was the subject of what Plaintiffs describe as an "administrative proceeding." At this proceeding, the State Administration for Industry and Commerce ("SAIC") — a powerful Chinese regulatory agency — warned the Company that it lacked appropriate internal controls, was operating in contravention of Chinese laws and regulations, and could be subject to substantial financial fines. According to Plaintiffs, failing to disclose the pendency of the "administrative proceeding" rendered the Company's registration statement, filed by the

1

Company in connection with its initial public offering ("IPO"), misleading, despite its extensive cautionary disclosures.

Plaintiffs purchased either Alibaba American Depository Shares ("ADSs") or call options to purchase Alibaba ADSs between September 19, 2014 and January 29, 2015. On behalf of themselves and a putative class of other similarly situated investors, Plaintiffs sued Alibaba, its founder and the Executive Chairman of its Board of Directors, Jack Ma ("Ma"), its co-founder and Executive Vice Chairman, Joseph Tsai ("Tsai"), its Chief Executive Officer ("CEO") and director, Jonathan Zhaoxi Lu ("Lu"), and its Chief Financial Officer ("CFO"), Maggie Wei Wu ("Wu") ("Individual Defendants," and collectively with Alibaba, "Defendants") for securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

Defendants now move, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, to dismiss Plaintiffs' claims. Defendants assert that Plaintiffs' Consolidated Class Action Complaint (the "Consolidated Complaint") fails to allege facts showing that Defendants made any materially false or misleading statements or omissions, giving rise to a strong inference that Defendants acted with scienter, and establishing loss causation for many of the alleged misstatements and omissions.

For the reasons stated below, Defendants' motion to dismiss the Consolidated Complaint is granted.

## BACKGROUND

The following facts — taken from the Consolidated Complaint, documents referenced therein, and matters of which the Court can take judicial notice — are assumed to be true for purposes of this motion, and are viewed in the light most favorable to Plaintiffs as the non-

2

moving parties. *See, e.g., Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

Alibaba is an e-commerce company based in the People's Republic of China ("China" or the "PRC"). It operates several highly popular online marketplaces. (Consolidated Compl. ("CC") ¶¶ 35-38.) On these marketplaces, independent third party merchants sell products to wholesale and retail buyers around the world. (*Id.* ¶ 35.) Alibaba's two largest marketplaces, Taobao and Tmall, account for over 80% of the products sold on Alibaba's websites. (*Id.* ¶ 38.)

Alibaba has been widely criticized for failing to stop the sale of counterfeit goods on its marketplaces. (*Id.* ¶ 42.) In 2005, two years after Alibaba opened Taobao, its first consumer-to-consumer marketplace, the United States Trade Representative ("U.S. Trade Representative") reported that "counterfeiters from all over the world converge on the alibaba.com site." (*Id.* ¶ 42.) In its 2008, 2009, and 2010 annual reports, the U.S. Trade Representative designated both Taobao and Alibaba as "Notorious Markets" that engage in or facilitate substantial copyright or trademark infringement. (*Id.* ¶¶ 44, 46.)

Though Alibaba and Taobao were removed from the list of designated Notorious Markets in 2011 and 2012, respectively, Alibaba acknowledges that it continues to face challenges related to counterfeit sales. Though it has adopted measures to reduce the sale of counterfeit and defective goods on its sites, it admits that these measures are not always successful. (*See, e.g., id.* ¶¶ 178, 186.) When asked about counterfeit sales in a "60 Minutes" interview, for instance, Ma stated:

> We are making progress. We are the doctors that are helping to cure the cancer. But the cancer is so aggressive. If you kill the doctor the cancer is still there. You buy one fake product, you are angry. But for us it's all our business.

(*Id.* ¶ 178.)

3

## A. The SAIC

The SAIC regulates all businesses in China. It promulgates rules and enforces laws and regulations affecting Chinese business activities, including e-commerce. (*Id.* ¶¶ 51-54.) One of the SAIC's 17 departments, the Department of Market Regulation, is specifically tasked with regulating online transactions in goods and services. (*Id.* ¶ 55.) The SAIC also oversees and coordinates the regulatory activities of local Administrations for Industry and Commerce ("AICs").

The SAIC's e-commerce rule-making and enforcement efforts have increased substantially in recent years, in response to the rapid growth of China's market for online shopping. Two significant sets of laws and regulations applicable to online platform operators like Alibaba went into effect in 2014: the Administrative Measures of Online Trading (the "Administrative Measures") and the amended PRC Consumer Rights and Interests Protections Law (the "PRC Consumer Rights Law"). (*Id.* ¶¶ 147, 149; Decl. of Jonathan K. Youngwood ISO Defs.' Mot. to Dismiss Pls.' Cons. Class Action Compl. ("Youngwood Decl.") Exhs. F-G.)

On June 12, 2014, the SAIC announced the launch of the "Red Shield and Web Sword" program ("Red Shield Program"), a high-profile initiative designed to investigate and reduce the sale of counterfeit, fake, shoddy, defective, and illegal products, as well as the operations of unlicensed merchants and the use of certain unfair business practices, such as the use of phony customer reviews and ratings. (CC ¶ 58.) The SAIC committed to publishing a final report on the results of the Red Shield Program, together with a list of online vendors "including specific names and web addresses" with "three or more typical cases concerning breach of law . . . to the SAIC Department of Market Regulation via the SAIC e-commerce regulatory platform." (*Id.* ¶ 62.) As part of the program, e-commerce platform operators such as Alibaba were told to support

4

the SAIC's efforts actively, and to carry out "self-examination" and "self-correction" —
including by punishing illegal acts on their platforms. (*Id.* ¶ 165.)

On July 16, 2014, shortly after the SAIC announced the launch of the Red Shield
Program, the Department of Market Regulation and representatives of several provincial AICs
called a meeting with Alibaba ("the July 16 Meeting") to provide the company with
"administrative guidance" regarding potential violations of PRC law on Alibaba's Taobao and
Tmall platforms. (*Id.* ¶¶ 63-64.) Administrative guidance in China's business regulatory scheme
is an informal regulatory tool used by the SAIC to encourage businesses and industries to self-
regulate. The SAIC's Rules Regarding Administration for Industry and Commerce Agencies'
Administrative Guidance Work ("Administrative Guidance Rules" or "the Rules") defines
administrative guidance as:

> the act of an AIC agency, within the scope of its legal authority and by way of *non-compulsory* measures such as advising, tutoring, reminding, admonishing, demonstrating by examples, publishing, summoning for meeting, etc., to lead citizens, legal persons and other entities (hereinafter 'Administrative Counterparty') *to willingly perform or not perform certain acts*, in order to achieve certain administrative objectives.

(CC Exh. 3 at 14 (emphasis added).) It is designed to "guide and help administrative
counterparties to improve their operational management, prevent or avoid their violation of any
administrative laws, regulations and rules." (*Id.* at 16.)

Administrative guidance is not designed to compel. The Rules stress that "The
implementation of administrative guidance shall be based on the free will of the administrative
counterparty," and that "No compulsory measures, compulsory measures in a disguised form[,]
or administrative measure against the administrative counterparty to accept administrative
guidance" shall be taken. (*Id.* at 14.) Indeed, the Rules state that administrative guidance "shall

5

be terminated . . . [w]here the administrative counterpart expressly refused to accept the administrative guidance . . . ." (*Id.* at 19.)

The SAIC's administrative guidance to Alibaba consisted of a list of concerns it identified when reviewing Alibaba's operations. The concerns related to: (i) unlicensed vendors, (ii) the sale of counterfeit and other prohibited items, (iii) consumer protection issues concerning advertising, sales, and promotional activities, (iv) flawed ratings of merchants and products, and (v) lax internal controls that may have led to certain merchants receiving preferential treatment. (*Id.* ¶ 70; see also CC Exh. 1 at 13.)

A senior manager from each of Alibaba's core departments attended the meeting and accepted the Administrative Guidance. None of the Individual Defendants attended. (CC ¶ 64.)

The SAIC did not make any formal findings at the July 16 Meeting. The SAIC also did not direct the Company to address its concerns in any particular manner or by a certain date.

Plaintiffs have not alleged that Alibaba was ever investigated, fined, or penalized as part of the Red Shield Program, or otherwise. One Chinese blogger, who is not alleged to be affiliated with the Chinese government or Chinese mainstream media, reported, without identifying a source, that "some participants of the [July 16] meeting revealed" that the SAIC's Director General warned Alibaba during the meeting that the SAIC was prepared to "penalize Alibaba 1,000 times or even several thousand times a year," with each fine amounting to 1% of Alibaba's daily sales amounts." (CC ¶ 72; *see also* CC Exh. 7 at 8.)

## B. Alibaba's IPO Disclosures

Alibaba's initial public offering ("IPO") on the New York Stock Exchange took place on September 19, 2014 — just two months after the July 16 Meeting. (*Id.* ¶¶ 98-101.)

6

Ahead of its IPO, Alibaba filed a registration statement with the Securities and Exchange Commission ("SEC") for the sale of Alibaba ADSs. The SEC declared an amended version of the registration statement (the "Registration Statement") effective on September 18, 2014. Alibaba filed the final Prospectus for the IPO, which forms part of the Registration Statement, on September 22, 2014. (*Id.* ¶¶ 100-101, 235.)

The Registration Statement contained a litany of disclosures about the pitfalls of e-commerce, the Chinese regulatory environment, and the attendant risks to Alibaba's business. (*See, e.g.,* Decl. of Laurence M. Rosen ISO Pls.' Opp'n to Defs.' Mot. to Dismiss Cons. Class Action Compl. ("Rosen Decl.") Exhs. C-1 at 47-70, C-3 at 24-36.) This included disclosures addressing the likelihood that China would continue to issue new laws and regulations that could adversely affect Alibaba and the rest of the Chinese e-commerce industry. For instance, Alibaba disclosed:

- "The PRC government authorities are likely to continue to issue new laws, rules and regulations governing [the industries in which Alibaba operates, which] could also result in additional compliance obligations and increased costs or place restrictions upon our current or future operations." (Rosen Decl. Exh. C-1. at 47.)

- "China has enacted laws and regulations governing Internet access and the distribution of products, services, news, information, audio-video programs and other content through the Internet . . . [and Alibaba] may be accused of infringing intellectual property rights of third parties and content restrictions of relevant laws." (*Id.* at 48.)

- "There are uncertainties regarding the interpretation and enforcement of PRC laws, rules and regulations. . . . In particular, because these laws, rules and regulations are relatively new, and because of the limited number of published decisions and the nonbinding nature of such decisions, and because the laws, rules and regulations often give the relevant regulator significant discretion in how to enforce them, the interpretation and enforcement of these laws, rules and regulations involve uncertainties and can be inconsistent and unpredictable. . . . Any administrative and court proceedings in China may be protracted, resulting in substantial costs and diversions of resources and management attention." (*Id.* at 61.)

- "[B]ecause [Chinese] laws, rules and regulations [affecting economic matters] are relatively new, and because of the limited number of published decisions and the

7

nonbinding nature of such decisions, and because the laws, rules and regulations often give the relevant regulator significant discretion in how to enforce them, the interpretation and enforcement of these laws, rules and regulations involve uncertainties and can be inconsistent and unpredictable. In addition, the PRC legal system is based in part on government policies and internal rules, some of which are not published on a timely basis or at all, and which may have a retroactive effect. As a result, we may not be aware of our violation of these policies and rules until after the occurrence of the violation." (*Id.*)

More specifically, Alibaba disclosed that the SAIC's Administrative Measures and the

PRC Consumer Rights Law required it to police its marketplaces for unlicensed merchants and

counterfeit goods and made it jointly and severally liable for violations of Chinese law on its

platforms. Alibaba disclosed that:

- "[The Administrative Measures] impose more stringent requirements and obligations on the online trading or service operators as well as the marketplace platform providers. For example, the marketplace platform providers are obligated to examine the legal status of each third-party merchant selling products or services on the platform and display on a prominent location on the web page of such merchant the information state in the merchant's business license or a link to such business license, and a group buying website operator must only allow a third-party merchant with a proper business license to sell products or services on its platform." (Rosen Decl. Exh. C-3 at 26.)

- "[The PRC Consumer Rights Law] provided stringent requirements and obligations on business operators, including Internet business operators and platform service providers like us. . . . [P]latform service providers may be jointly and severally liable with sellers and manufactures if they are aware of should be aware that the seller or manufacturer is using the online platform to infringe upon the lawful rights and interests of consumers and fail to take measures necessary to prevent or stop such activity. Failure to comply with these consumer protection laws could subject us to administrative sanction . . . ." (*Id.* at 29.)

- "Under the Tort Liability Law of the PRC, an Internet service provider may be subject to joint liability if it is aware that an Internet user is infringing upon the intellectual property rights of others through its Internet services, such as selling counterfeit products, and fails to take necessary measures to stop the activity." (*Id.* at 29.)

- "[Under the Administrative Measures,] as an operator of an online trading platform for online trading, we must adopt measures to ensure safe online transactions, protect consumers' rights and prevent trademark infringement." (*Id.* at 30.)

8

Alibaba did not disclose the existence of the July 16 Meeting or reveal that it had received administrative guidance from the SAIC. In fact, Alibaba did not specifically disclose the existence of the Red Shield Program; it said, however, that the SAIC had, in recent years, "strengthened enforcement actions, including levying significant fines" in the context of the new Anti-Monopoly law, and emphasized that it expected to face "increased scrutiny from regulators" as it grew. (Rosen Decl. Exh. C-1 at 48, 49.)

Moreover, Alibaba disclosed that it had been criticized in the past due to the sale of pirated, counterfeit and illegal products on its sites — including that Alibaba and Taobao had been designated "Notorious Markets" by the U.S. Trade Representative — and that it faced legal, regulatory, and financial exposure both if it attempted to reduce the sales of such products and failed to do so. Specifically, Alibaba disclosed:

- "Although we have adopted measures to verify the authenticity of products sold on our marketplaces and minimize potential infringement of third-party intellectual property rights through our intellectual property infringement complaint and take-down procedures, these measures may not always be successful. We have been and may continue to be subject to allegations of civil or criminal liability based on allegedly unlawful activities carried out by third parties through our online marketplaces. We also have been and may continue to be subject to allegations that we were participants in or facilitators of such allegedly unlawful activities." (*Id.* at 37.)

- "In the event that alleged counterfeit or infringing products are listed or sold on our marketplaces or our other services, we could face claims relating to such listings or sales or for our alleged failure to act in a timely or effective manner in response to infringement or to otherwise restrict or limit such sales or infringement." (*Id.*)

- "We may implement further measures in an effort to strengthen our protection against these potential liabilities that could require us to spend substantial additional resources and/or experience reduced revenues by discontinuing certain service offerings. In addition, these changes may reduce the attractiveness of our marketplaces and other services to buyers, sellers or other users." (*Id.* at 38.)

- "Additional measures that we take to address fraud could also negatively affect the attractiveness of our marketplaces to buyers or sellers." (*Id.*)

9

Other practices Alibaba disclosed were sellers' use of "fictitious or 'phantom'

transactions" to "artificially inflate their own ratings on our marketplaces, reputation and search

results rankings," and the risk posed by employees' "illegal, fraudulent or collusive activities,"

specifically employees' acceptance of payments in return for preferential treatment on Alibaba

marketplaces. (*Id.* at 38.)

Finally, Alibaba disclosed that it could be the subject of regulatory investigations and

enforcement actions, and stated that it expected to be the target of regulatory scrutiny in the

future. Specifically, Alibaba disclosed:

- Alibaba had "from time to time been subject to PRC and other foreign government inquiries and investigations, including those relating to website content and alleged third-party intellectual property infringement," but that "None of these inquiries and investigations has resulted in significant restrictions on our business operations." (*Id.* at 47-48.) However, as it "continue[s] to grow in scale and significance," it "expect[s] to face increased scrutiny, *which will, at a minimum, result in our having to increase our investment in compliance and related capabilities and systems*." (Rosen Decl. Exh. C-3 at 47 (emphasis added).)

- "[T]wo of the three PRC anti-monopoly enforcement agencies, the National Development and Reform Commission, or the NDRC, and the State Administration for Industry and Commerce, or the SAIC, have in recent years strengthened enforcement actions, including levying significant fines, with respect to cartel activity as well as abusive behavior of companies having market dominance." (*Id.* at 48.)

### C. Disclosure of the July 16 Meeting and the Administrative Guidance

On January 27, 2015, a white paper (the "White Paper") appeared briefly on the SAIC

website. The White Paper purportedly described what occurred at the July 16 Meeting and

outlined the administrative guidance given to Alibaba. (*Id.* ¶¶ 16, 94, 191; CC Exh. 1.) The

White Paper announced that the Department of Market Regulations had expressed concerns

related to unlicensed vendors; the sale of counterfeit and other prohibited items; consumer

protection issues concerning advertising, sales, and promotional activities; flawed ratings of

merchants and products; and lax internal controls that may have led to certain merchants'

10

receiving preferential treatment. More generally, the White Paper said that the SAIC was critical of Alibaba's response to violations of Chinese laws and regulations on its marketplaces. For instance, it quoted a statement, purportedly made by Department of Market Regulation Director General Liu Hongliang, that the, "Alibaba Group, for a long time, has failed to take seriously the operational violations on its e-commerce platforms and did not take effective measures to address the violations," which "caused a miniscule issue to snowball into a serious problem" and the "greatest credibility crisis since [Alibaba's] incorporation." (CC Exh. 1 at 11-12.) According to the White Paper, the Department of Market Regulation believed that this failure "set[] a bad example with negative influence on other law-abiding e-commerce companies," made Alibaba "a target of a torrent of blames from the public opinion," and created "tremendous pressure on market regulatory agencies." (*Id.*) With regard to trademark infringement in particular, the Department of Market Regulation "suspected that the platforms' operator knowingly, intentionally, by negligence or in spite of their presumed knowledge facilitates unlicensed operations, trademark infringements, untruthful publicity, pyramid schemes and violations of consumers' right." (*Id.* at 14.)

According to the White Paper, Alibaba acknowledged that several of its marketplaces were encountering difficulties related to "cracking down on counterfeits" and "hyped up credibility scores," and stated that, "The problems pointed out by [the] SAIC and local AICs [were] right on point" and the administrative guidance were "very prompt and well-grounded." (*Id.* at 21.) The White Paper revealed that Alibaba had committed to improving its compliance with PRC laws and regulations. (*Id.*)

The White Paper concluded that the "meeting has achieved its pre-set goal[s]" by making Alibaba "clearly aware of e-commerce regulatory agencies' severe concern and censure as to the

11

long existing misconduct on the platforms in [sic] Alibaba family," by cautioning the Company against self-congratulation, and by prompting it "to pay great attention to the severity of the problems and to promptly take measures to redress the problem." (*Id.* at 23-24.) The Department of Market Regulation "requested that Alibaba Group utilize this administrative guidance to improve its awareness, squarely face its problems, and take immediate actions to thoroughly redress all the issues identified by the regulatory agencies." (*Id.* at 12.)

The White Paper made no mention of penalties or the initiation of formal enforcement proceedings. (*See id*; *see also* CC ¶ 210.) Apparently, no such proceedings were ever commenced and no such penalties were ever imposed.

The White Paper was removed from the SAIC website a few hours after it appeared and was never reposted. However, several Western media outlets published articles reporting on its contents. (*Id.* ¶¶ 196-98.)

In a press release and earnings call on January 29, Alibaba acknowledged that the July 16 Meeting had taken place (*Id.* ¶ 210), but stated that the release of the White Paper, which it had not seen before it was published, "was so unfair that [it] felt compelled to take the extraordinary step of preparing a formal complaint to the SAIC." (Press Release, Joe Tsai Addressed Recent Interaction with SAIC (Jan. 29, 2015).) According to Alibaba, "like all international companies across the globe we from time to time meet with regulators in the normal course of business. [The July 16 Meeting] was no different. . . . [A]t this meeting we discussed working together to create a process to address key areas of consumer protection and orderly marketplace operations in online commerce." *Id.* Alibaba also summarized its procedures for dealing with alleged counterfeit goods, and stated that "our track record is clear. We are certainly not perfect, and we

12

have a lot of work ahead of us . . . [but] like all global companies in our industry, we must continue to do everything we can to stop these activities." (*Id.*)

Immediately after the release of the White Paper, the SEC launched an investigation into whether Alibaba had violated federal securities laws by failing to disclose the July 16 Meeting in its public filings. (*Id.* ¶ 219.) There is no allegation in the Consolidated Complaint that the SEC ever concluded that Alibaba had violated the law, brought suit, or commenced any sort of administrative proceeding against Alibaba on the ground that its IPO disclosures were misleading.[1]

Alibaba's stock price fell on January 28 and January 29. Alibaba's ADS price fell $4.49 on January 28, 2015, to close at $98.45 (a 4.4% decrease), and $8.64 on January 29, 2015, to close at $89.81 (a decrease of almost 9%). (*Id.* ¶¶ 207, 213.) The two-day decline in the price of Alibaba ADSs eliminated approximately $33 billion in Alibaba's market capitalization. (*Id.* ¶ 216.)

### D. Plaintiffs' Allegations of Wrongdoing

In the weeks following Alibaba's January 29 press release and earnings call, six class action lawsuits were filed against Alibaba and the Individual Defendants in the Southern District of New York and the Central District of California. The United States Judicial Panel on Multidistrict Litigation consolidated the six actions and assigned them to this Court. (Transfer Order (Dkt. No. 1).) A seventh action filed in the Northern District of California was later added. (*See* Dkt. No. 2.)

---

[1] The recent announcement of an SEC inquiry into Alibaba's accounting practices is not germane to this lawsuit. *See* Paul Mozur, *Alibaba Faces U.S. Accounting Inquiry*, N.Y. Times, May 25, 2016, *available* at http://www.nytimes.com/2016/05/26/business/dealbook/alibaba-faces-us-accounting-inquiry.html.

13

On July 1, 2015, Plaintiffs filed the Consolidated Complaint, which alleged that Defendants knowingly or recklessly concealed the information contained in the White Paper so as to artificially inflate the price of Alibaba ADSs sold in the IPO. (*See* Dkt. No. 6.)

The Consolidated Complaint alleges that Alibaba's Registration Statement failed to disclose that Alibaba had been visited by, and received administrative guidance from, the SAIC on July 16, 2014. (CC ¶ 102.) The Consolidated Complaint also alleges that the Registration Statement omitted that Alibaba was a "target" of the Red Shield Program, and that a material portion of Alibaba's earnings were derived from counterfeit goods. According to Plaintiffs, "the effects on Alibaba of Red Shield, the July 16 Meeting, and the Administrative Guidance must be evaluated together and considered in the context of the business climate in China;" the Red Shield Program allegations, in particular, exist to "underscore the materiality of the July 16 Meeting and Administrative Guidance, adding context to Defendants' duty to disclose." (Pls.' Br. at 33). Plaintiffs make clear, then, that their allegations about the Red Shield Program and Alibaba's reliance on counterfeit goods are not independent violations of Section 10(b) and Rule 10b-5. (Pls.' Br. at 33, 39; Reply Mem. of Law in Further Support of Defs.' Mot. to Dismiss Pls.' Cons. Class Action Compl. (Dkt. No. 25) ("Reply Br.") at 13.) Rather, they are part and parcel of a single, unified allegation that the failure to disclose the fact of the July 16 Meeting and the delivery of administrative guidance by the SAIC violated the federal securities laws. (*Id.*)

The Consolidated Complaint also alleges that these omissions rendered materially false or misleading several other statements made by Defendants in advance of and following the IPO. The vast majority of these allegedly false or misleading statements are risk disclosures contained in the Registration Statement. But Plaintiffs also identify post-IPO statements made by

14

Defendants in a "60 Minutes" interview, two speeches, a press release, and two post-IPO SEC filings that they allege are misleading. (*Id.* ¶¶ 105-153, 178-189.)

As to all of these misstatements and omissions, Plaintiffs assert that Defendants had actual knowledge of, or acted recklessly toward, the falsity of their public statements. (*Id.* ¶ 291.) Plaintiffs also assert that, by virtue of Individual Defendants' positions at Alibaba, the Individual Defendants are liable as controlling persons under Section 20(a) of the Exchange Act.

## DISCUSSION

Defendants move to dismiss Plaintiffs' Section 10(b) claims on three grounds. First, they contend that the Consolidated Complaint fails to allege the existence of material misrepresentations or omissions. Second, they argue that the Consolidated Complaint fails to plead scienter with the requisite particularity. Third, they assert that the Consolidated Complaint fails to allege loss causation. The Individual Defendants seek dismissal of Plaintiffs' Section 20(a) claims because Plaintiffs have failed to plead a primary violation of the securities laws.

## I. Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). A complaint should be dismissed, where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

Generally, in deciding a motion to dismiss, the Court must accept all factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff. *See Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir. 2003); *see also Roth v. Jennings*, 489 F.3d 499,

15

510 (2d Cir. 2007). However, "Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–23 (2007). A complaint alleging securities fraud must meet the pleading requirements of Rule 9(b), which requires plaintiffs to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI*, 493 F.3d at 99.

A complaint alleging securities fraud must also meet the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b). Under the PSLRA, a plaintiff must "specify each statement [or omission] alleged to have been misleading [and] the reason or reasons why the statement is misleading" and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each act or omission. 15 U.S.C. § 78u–4. "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *ATSI*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 324) (alteration in original).

In deciding a motion to dismiss, a court may consider the full text of documents that are quoted in or attached to the complaint, or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit. See *Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000) (citing *Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991)); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir.

16

1996). In this case, that includes the entirety of the Registration Statement, all other public filings referenced in the Consolidated Complaint, including Alibaba press releases, and SAIC reports and guidelines, including the White Paper.

## II.    Plaintiffs Fail to State a Claim Under Section 10(b)

To allege a claim under Section 10(b) of the Exchange Act and Rule 10b-5, "a plaintiff must allege that [each] defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI*, 493 F.3d at 105.

As discussed below, Plaintiffs' Section 10(b) claims fail as a matter of law. Plaintiffs have failed to plead that Defendants made actionable misstatements or omissions and that they acted with scienter. Because these grounds are sufficient to find that Plaintiffs failed to state a claim, the Court does not address Defendants' argument that Plaintiffs have not alleged loss causation as to some of the alleged misstatements and omissions.

### A.    The Consolidated Complaint Does Not Allege Material Misstatements or Omissions

Alibaba's Registration Statement is unusually comprehensive. Alibaba disclosed that counterfeit and defective goods are sold on its marketplaces; that the United States Trade Representative had designated two of its marketplaces as "notorious markets"; that such sales exposed the Company to litigation and regulatory risks; that China was increasing its regulatory oversight of e-commerce companies; and that, while Alibaba was trying to reduce sales of counterfeit and defective goods, its efforts might not be successful. (*See, e.g.,* Rosen Decl. Exh. C-1 at 37-39, 46-47.) It also disclosed that it had been the subject of regulatory inquiries and investigations; that it expected to face scrutiny from regulators as it continued to grow; that

17

China had recently issued new laws and regulations aimed at e-commerce companies, like itself; that it was uncertain how the SAIC would interpret and enforce these new laws and regulations; and that Alibaba could be found liable under Chinese law and subject to administrative sanctions for failing to police the sale of counterfeit and defective goods on its sites. (*Id.* at 47-48.)

The only thing allegedly missing from this lengthy list of disclosures is that Alibaba met with the SAIC on July 16 and received non-binding Administrative Guidance — in essence, a reminder to Alibaba that the authorities, in a country far different from ours, were looking over its shoulder — and the name of the particular regulatory program. There is no allegation that Alibaba failed to disclose the pendency of any actual administrative proceeding or government sanction, and, in fact, Plaintiffs have not alleged that there is any such proceeding or sanction to disclose.

The only substantive question in this case is whether the fact of that meeting and the administrative guidance Alibaba received had to be disclosed in order to make the Registration Statement's general disclosures about heightened regulatory interest and the possibility of increased cost for compliance and related activities not misleading.

## 1. Omission of the July 16 Meeting and the Administrative Guidance

An alleged omission of fact is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (internal citations omitted.) "Put another way, a fact is to be considered material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock." *Operating Local 649 Annuity Tr. Fund v.*

18

*Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92–93 (2d Cir. 2010) (internal citation and quotation marks omitted).

However, a corporation is not required to disclose a fact merely because it would be of interest to a reasonable investor. *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). For instance, courts have held repeatedly that a company is not compelled to disclose every communication it has with a regulator — even where, as here, a regulator has informed a company of deficiencies in its operations. *See In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 542 (S.D.N.Y. 2015) (collecting cases), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016). In *Acito v. IMCERA Grp.*, 47 F.3d 47, 50, 52-53 (2d Cir. 1995), for example, the Second Circuit held that a manufacturer of animal health products did not need to disclose that as part of an application process, the Federal Drug Administration ("FDA") had inspected a subsidiary's manufacturing plant and twice reported numerous deficiencies. Among the reasons why the court held that the inspections did not need to be disclosed was that the two inspections had not resulted in any adverse action that affected earnings — even though a third inspection ultimately resulted in the company shutting down the facility. *Id.* at 52-53. Similarly, a court in *In re Sanofi* rejected claims that a pharmaceutical company had a duty to disclose "ongoing discussions with the FDA" in which the FDA expressed concerns about the company's testing methodology during the application process for a new drug. 87 F. Supp. 3d at 542. The court held that such "interim FDA feedback is not material" and need not be disclosed because it "does not express a binding agency decision and is subject to change as the FDA and pharmaceutical companies work together to develop viable clinical trials and approvable licensing applications." *Id.*

Under the securities laws, an omission is only actionable when the corporation is subject to a duty to disclose the omitted facts. *In re Time Warner*, 9 F.3d at 267. Such a duty to disclose

19

arises where a "statute or regulation requir[es] disclosure" or a corporate statement would otherwise be "inaccurate, incomplete, or misleading." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (quoting *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992)). Here, Plaintiffs contend that Defendants had a duty to disclose the existence of the July 16 Meeting, the administrative guidance it received, and any penalties that were threatened for three reasons: (1) to prevent statements in the Registration Statement from being misleading, (2) under SEC Regulation S-K, 27 C.F.R. 229.10, *et seq.*, Item 303 and Item 503, and Item 5(d) of Form 20-F, and (3) as a seller of stock.

### a. A Duty to Prevent Statements from Being Misleading

Plaintiffs first argue that the Registration Statement misled investors into concluding that sales of illegal and defective goods on Alibaba's websites did not pose a threat to Alibaba's financial performance, when, in actuality, an investigation into such sales was already taking place and was likely to lead to a material, adverse effect on Alibaba's business. (*See* Pls.' Br. at 21.) Because Alibaba's disclosures were not misleading, this argument fails.

Alibaba, like all companies subject to the federal securities laws, has a duty to disclose facts that are needed to assure that what was revealed in its public filings are not "so incomplete as to mislead." *In re Bristol Myers*, 586 F. Supp. 2d at 377. "Even where there is no existing independent duty to disclose information," there is a duty to tell the whole truth "once a company speaks on an issue or topic." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2014). But that duty is not boundless. As is the case here, "revealing one fact about a subject does not trigger a duty to reveal all facts on the subject." *Richman v. Goldman Sachs Group, Inc.*, 868 F. Supp. 2d 261, 274 (2012). In determining whether omissions and statements are actionable, "the proper inquiry requires an examination of defendants' statements and omissions

20

in context and taken together." *Jinkosolar*, 761 F.3d at 250-51. In other words, we look to the "total mix" of available information.

Alibaba's risk disclosures are sufficiently sober about the threat posed by counterfeit sales. Alibaba disclosed that it received complaints about intellectual property infringement on its sites, and it warned investors that it might be accused of facilitating such conduct in the future. It also disclosed that it had adopted measures to "verify the authenticity of products sold on [its] marketplaces and minimize potential infringement of third-party intellectual property rights," that these measures might not be successful, and that, either way, the measures would result in certain costs to the Company, such as "reduc[ing] the attractiveness of [its] marketplaces and other services to buyers, sellers or other users." (*Id.* at 37, 46.) The omission of the July 16 Meeting in no way renders these disclosures inaccurate, incomplete, or misleading.

The disclosures also do not minimize the risk of regulatory investigations or other litigation. Alibaba disclosed that regulators in China, as well as in other countries, had initiated inquiries and investigations into the persistence of counterfeit sales on Alibaba's marketplaces. (*Id.* at 47.) The Registration Statement discloses that, "None of these inquiries and investigations has resulted in significant restrictions on [its] business operations," and there is no suggestion in the pleading that this is untrue. Certainly there is no allegation that Chinese regulators ever imposed "significant restrictions" on Alibaba's business. (*Id.* at 47-48.)

The Registration Statement did not specifically mention the "Red Shield Program," but Plaintiffs allege that the program was widely publicized, which put the public on notice that the SAIC was targeting sellers of counterfeit and defective goods. (*See* CC ¶ 50.) Because "the securities laws do not require disclosure of information that is publicly known," *Garber v. Legg*

21

*Mason, Inc.*, 537 F. Supp. 2d 597, 611 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 665 (2d Cir. 2009), Alibaba's failure to disclose the name of the particular program is not actionable.

In any event, Alibaba did disclose that Chinese regulators — including the SAIC — had increasingly turned their attention to market dominant companies, like itself. (*Id.* at 47-48.) It also disclosed that Alibaba "expect[s] to face increased scrutiny" from those regulators as it continues to grow "in scale and significance" (*Id.* at 41, 47-49, 52) — and that the mere perception that counterfeit and defective goods are commonplace on its platforms could pressure regulators to investigate further and that there could be increased compliance costs (*Id.* at 46-48). These disclosures make clear that the Company had faced significant litigation exposure in the past and was likely to continue to do so in the future — perhaps at an enhanced level. That Alibaba met with regulations and received what, under the SAIC's own rules, was informal and non-binding guidance, does not render inaccurate any statement about the likelihood of an actual inquiry or investigation taking place.

Even if these disclosures were not themselves sufficient, they must be read in the context of the entire Registration Statement, which makes clear that Chinese companies are subject to a rapidly evolving and often erratic legal and regulatory system. (*See, e.g.,* Rosen Decl. Exh. C-1 at 47.) According to the Registration Statement, China's economic system is relatively young, the country "has not developed a fully integrated legal system," and the laws, rules, and regulations that are on the books "may be subject to significant degrees of interpretation by PRC regulatory agencies." (*Id.* at 61.)

> In particular, because [Chinese] laws, rules and regulations [affecting economic matters] are relatively new, and because of the limited number of published decisions and the nonbinding nature of such decisions, and because the laws, rules and regulations often give the relevant regulator significant discretion in how to enforce them, the interpretation and enforcement of these laws, rules and regulations involve uncertainties and can be inconsistent and unpredictable. In addition, the PRC legal system is based in

part on government policies and internal rules, some of which are not published on a timely basis or at all, and which may have a retroactive effect. As a result, we may not be aware of our violation of these policies and rules until after the occurrence of the violation.

(*Id.*) These disclosures clearly articulate the fact that investors in Chinese companies are exposed to substantial risk and uncertainty — more, mostly likely, than if they were to invest in a company located in a more mature regulatory environment. Indeed, this Court would be shocked if investors did not take the fact that China is not the United States into account when making an investment.[2]

Collectively, these disclosures are more than sufficient to warn investors that Alibaba faced continuing risks related to the sale of counterfeit goods in its marketplaces, and that it could face enforcement actions and substantial fines should it fail to properly police its marketplaces for defective and illegal goods. They make clear that China's legal and regulatory environment make investing in a Chinese company, like Alibaba, risky. None of these statements, or any of the other identified by Plaintiffs, is misleading absent disclosure of the July 16 Meeting.

Plaintiffs' attempts to support their argument are unavailing. While certain statements in the Registration Statement — particularly that no inquiry or investigation ". . . has resulted in significant restrictions on our business operations" — could, under different circumstances, need to be disclosed, *see e.g., Menaldi v. Och-Ziff Capital Management Group LLC*, No. 14-cv-3251 (JPO), 2016 WL 634079 (S.D.N.Y. Feb. 17, 2016); *In re BioScrip, Inc., Sec. Litig.*, 95 F. Supp. 3d 711, 727 (S.D.N.Y. 2015), they do not do so here, because Plaintiffs have not alleged facts

---

[2] The Court is well aware that many U.S. investors have lost considerable money in Chinese investments; the phenomenon of the disappearing U.S. shell corporation has been the subject of much litigation. *See, e.g., In re Advanced Battery Techs., Inc.*, 781 F.3d 638 (2d Cir. 2015).

tending to show that Alibaba *actually* faced a government inquiry or investigation that was *likely* to result in significant restrictions on Alibaba's business operations. All Plaintiffs have alleged is that Alibaba attended a meeting with Chinese regulators, at which it received *nonbinding* administrative guidance aimed at encouraging Alibaba "to *willingly* perform or not perform certain acts" — and that Alibaba "accepted the guidance." (*See* CC Exh. 3 at 11, 14 (emphasis added); CC ¶ 10.) At most, Alibaba's "acceptance" of the administrative guidance means that Alibaba acknowledged that it had problems — problems that it fully disclosed in the Registration Statement — and was aware of its legal and regulatory obligations. There is nothing in the pleading or in the record to indicate that "acceptance" meant Alibaba intended to alter its business operations or that it expected any diminution in revenues. Indeed, the Second Circuit has noted that "one cannot infer that it [is] a foregone conclusion that . . . adverse consequences [will] ensue" where a defendant "made commitments" to a regulator "to correct [identified] deficiencies." *See Acito*, 47 F.3d at 54.

Notwithstanding the express prohibition on the SAIC's use of "compulsory measures in a disguised form," Plaintiffs argue that there is nothing "voluntary" or "informal" about administrative guidance issued by China's chief corporate regulator. (CC Exh. 3 at 19; Pls.' Br. at 15.) Given the "extremely heightened level of scrutiny of Alibaba's business by a central corporate regulator in China," Plaintiffs contend that the administrative guidance must have been especially compulsory and formal and thus likely to lead to significant changes in Alibaba's operations. (Pls.' Br. at 15.)

Plaintiffs offer no factual support for that conclusion. They have not alleged that the SAIC subsequently took any action to increase its oversight over Alibaba or to exercise its formal enforcement powers. They even acknowledge in the Consolidated Complaint that

24

"Alibaba's failure to accept the administrative guidance and follow the directions set forth by the SAIC and the seven AICs" would have only created "a high *risk* of administrative penalization" (CC ¶ 91 (emphasis added)) — not that it constituted an administrative penalty in its own right. I conclude that Plaintiffs must be inferring something about the Chinese regulatory system that should cause this Court not to defer to that system's pronouncements about what its procedures are what they mean. Plaintiffs allege no facts that would allow this Court to follow such a course.

Then there is the problem of the White Paper itself. Considering that the White Paper was posted on the SAIC's website only briefly before being quickly withdrawn, Plaintiffs' reliance on its contents is tenuous at best. Plaintiffs argue that the quick withdrawal of the White Paper suggests Alibaba's sway over Chinese regulators; it also supports the equally, if not more, compelling inference that the posting was unauthorized and, hence, not to be trusted. That competing inference is lent further credence by the fact that the SAIC never subsequently initiated any formal enforcement action against Alibaba, and that the SEC, which investigated Alibaba's compliance with US securities laws after the White Paper's posting, never moved forward with a formal investigation or leveled any charges.

Further, a principal basis alleged in the Consolidated Complaint for giving credit to the White Paper was that Alibaba "confirmed the authenticity of the White Paper and the harsh position taken by the SAIC." (*See* Compl. ¶ 210.) In fact, that allegation is contradicted by the document to which the Consolidated Complaint refers — the press release issued by Alibaba immediately after the White Paper was posted. In that press release, the only thing Alibaba confirmed was the date of the Meeting. It not only denied the rest, but it announced that it had

25

filed a complaint with the SAIC protesting the posting of the White Paper. (*See, supra,* at 12-13.)[3]

But even assuming the White Paper were to be believed, nothing in it suggest that the July 16 Meeting constituted some sort of formal enforcement proceeding. It says that the meeting met SAIC's "pre-set goal[s]" by making Alibaba "clearly aware of e-commerce regulatory agencies' severe concern and censure as to the long existing misconduct on the platforms in [sic] Alibaba family," cautioning it against self-congratulation, and prompting it "to pay great attention to the severity of the problems and to promptly take measures to redress the problem." (*See, e.g.,* White Paper at 24.) Making Alibaba aware of concerns and prompting it to pay attention to problems it had plainly disclosed is not tantamount to the institution of a formal regulatory proceeding. *See generally Acito,* 47 F.3d at 54.

The Court also cannot put much weight on Plaintiffs' allegation that the SAIC threatened to penalize Alibaba "1% of daily sales amounts" and "several thousand times a year," because this allegation is supported by a single blogger who is not affiliated with the government and who cites an anonymous source. (*See* CC ¶¶ 72, 91, 97; *see also* CC Ex. 7.) For Plaintiffs to rely on an unnamed confidential source, they must allege sufficient facts "to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks,* 216 F.3d 300, 314 (2d Cir. 2000); *see also In re AOL, Inc. Repurchase Offer Litig.,* 966 F.Supp. 2d 307, 314 (S.D.N.Y. 2013) (applying *Novak* to blog post citing unnamed sources). They have alleged no such facts. Since the White Paper contains no mention of any

---

[3] The Court may "consider matters of which judicial notice may be taken under Federal Rule of Evidence 201," including press releases, in deciding this motion. *See In re Foreign Exch. Benchmark Rates Antitrust Litig.,* 74 F. Supp. 3d 581, 588 n.4 (S.D.N.Y. 2015) (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir. 1991)).

penalties, the let alone this particular penalty, Plaintiffs' allegation is simply not as credible as the competing inference that the anonymous source was merely speculating. And Alibaba did disclose that Chinese regulators, including the SAIC, were "strengthen[ing] enforcement actions, including levying significant fines" with respect to "abusive behavior of companies having market dominance." (Rosen Decl. Exh. C-1 at 49; *see also* Rosen Decl. Exh. C-3 at 29.)

Plaintiffs next argue that, absent disclosure of the July 16 Meeting and Alibaba's receipt of Administrative Guidance, the Registration Statement downplays the risk posed by the uncurbed sale of counterfeit goods on its marketplaces. In support of their position, Plaintiffs cite *Meyer v. Jinkosolar Holdings Co., Ltd*, in which the Second Circuit held that a company's description of pollution-preventing equipment and 24-hour environmental monitoring teams could have given false comfort to investors by leading them to believe the company was taking reasonably effective steps to comply with environmental regulations. 761 F.3d at 251. As the court noted, "One cannot, for example, disclose in a securities offering a business's peculiar risk of fire, the installation of a comprehensive sprinkler system to reduce fire danger, and omit the fact that the system has been found to be inoperable, without misleading investors." *Id.*

But if *Jinkosolar* were relevant here, it would only be to illustrate the adequacy of Alibaba's disclosures. Unlike the company in *Jinkosolar*, Alibaba did not represent that its efforts to comply with the law were particularly effective, let alone foolproof; as discussed above, its disclosures were not likely to "cause a reasonable investor to make an overly optimistic assessment of the risk." (*See* Rosen Decl. Exh. C-3 at 37.) *See Jinkosolar*, 761 F.3d at 251. Alibaba's disclosure about "illegal, fraudulent or collusive activities by our employees" — namely, that employees had "accepted payments from sellers in order to receive preferential treatment" — was even more explicit in stating that the Company's efforts to address the issue

27

did not guarantee success. According to the Registration Statement, "Although we dismissed the employees . . . [and] further strengthen[ed] our internal controls and policies . . . we cannot assure you that such controls and policies will prevent fraud or illegal activity by our employees or that similar incidents will not occur in the future." (CC ¶ 118.) Alibaba also disclosed that failure to correct the situation could subject it to regulatory risks. By comparison, the company in *Jinkosolar* merely disclosed that environmental violations generally posed a financial risk to the company, while not cautioning investors that it knew its efforts to comply with Chinese law were failing and could expose it to penalties. *See* 761 F.3d at 251.

Finally, Plaintiffs argue that once, "Defendants ventured to speak on the topics of counterfeiting, their efforts against it, and their legal compliance . . . they had a duty to tell the whole truth, including the Company's receipt of harsh administrative guidance at the July 16 Meeting." (Pls.' Br. at 21.) But this interpretation of the duty to disclose is far too broad. Discussing a topic — like risks related to the sale of illegal and defective products on Alibaba's websites — does not trigger a duty to reveal every fact that might be relevant to that subject. *See, e.g., Richman*, 868 F. Supp. 2d at 274.

Considering in context all of Alibaba's statements on "the topics of counterfeiting," Alibaba's "efforts against it," the domestic and foreign regulatory environment, the increased scrutiny it was receiving in China, and its "legal compliance" — as the Court must — it is clear that Alibaba did not downplay its problem with counterfeit sales on its platforms or the likelihood of an administrative action against it. Accordingly, Alibaba's statements were not so incomplete as to give rise to a duty to disclose the July 16 Meeting or the receipt of Administrative Guidance.

b. A Regulatory Duty to Disclose

Plaintiffs argue that Defendants violated their obligations under Regulation S-K Items 303, applicable to foreign corporations under Item 5(d) of Form 20-F, and 503 by not disclosing the existence of the July 16 Meeting and Alibaba's receipt of administrative guidance. Neither regulation compel disclosure.

Item 303 imposes specific disclosure requirements on companies filing Registration Statements with the SEC, as well as annual, quarterly, and periodic financial statements. *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015). As relevant here, Item 303 requires that Registration Statements "[d]escribe any known trends of uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales ore revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Disclosure under Item 303 "is necessary 'where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations.'" *Stratte-McClure*, 776 F.3d at 101 (quoting Management's Discussion and Analysis of Fin. Condition and Results of Operations, Securities Act Release No. 6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18, 1989). The "failure to comply with Item 303 . . . can give rise to liability under Rule 10b-5 so long as the omission is material under *Basic [Inc. v. Levinson*, 485 U.S. 224 (1988)], and the other elements of Rule 10b-5 have been established." *Stratte-McClure*, 776 F.3d at 103-104.

Though Item 303 does not apply to foreign corporations, the SEC has stated that its interpretations of Item 303 "apply to [Management Discussion & Analysis disclosures] drafted pursuant to Item 5 of Form 20-F," which does apply to foreign corporations. *See* In Re Comm'n

29

Guidance Regarding MD&A of Fin. Condition & Results of Operation, Release No. 8350 (Dec. 19, 2003). Accordingly, the Court will "interpret [Item 5 of Form 20-F] as calling for the same disclosure as Item 303 of Regulation S-K." *See* Release No. 33-7745 (Sept. 28, 1999) [64 FR 53900 at 59304].

The disclosure obligations of Item 303 and, by extension, Item 5(d) of 20-F, do not compel Defendants to disclose the existence of the July 16 Meeting or the SAIC's administrative guidance for substantially the same reasons as stated above: Plaintiffs have not alleged that the July 16 Meeting or the receipt of Administrative Guidance was "reasonably likely to have material effects on [Alibaba's] financial conditions or results of operations." *See Stratte-McClure*, 776 F.3d at 101. Because the administrative guidance Alibaba received at the July 16 Meeting was non-compulsory and Plaintiffs have not alleged any subsequent actions by the SAIC to move forward with a formal enforcement action or penalties — for instance, requesting or subpoenaing documents, interviewing employees, or engaging in any of the other hallmarks of a government investigation — Plaintiffs have not pleaded facts indicating that Alibaba faced the sort of "serious, ongoing criminal and civil investigations that expose[] it to potential criminal and civil liability," which would have needed to be disclosed under Item 303. *Indiana Pub. Ret. Sys. v. SAIC*, Inc., No. 14-4140-CV, 2016 WL 1211858, at *11 (2d Cir. Mar. 29, 2016).

Plaintiffs cite *Indiana Public Retirement System v. SAIC*[4] to argue that Item 303 requires disclosures of even a *potential* harm to a company's business. (Dkt. 27 at 3.) However, the Second Circuit has never imposed such a sweeping disclosure obligation. *See Ind. Pub. Ret. Sys.*, 2016 WL 1211858, at *11. In *Indiana Public Retirement System*, the Second Circuit held that a

---

[4] SAIC, Inc., a defendant in *Indiana Public Retirement System*, is an American corporation with no relation to the Chinese regulator.

government contractor violated Item 303 by failing to disclose that it had overbilled various New York City agencies by millions of dollars and that the overbilling practices subjected it to monetary and reputational risks. The court held that the complaint alleged that the company, which had initiated its own internal investigation, knew that its employees had committed fraud well before it publicly disclosed that the United States Department of Justice and the New York City Department of Investigation were conducting a joint criminal investigation. Though the company was uncertain about the effect on its current and future revenues, the court held that Item 303 obligated it "to disclose the manner in which that then-known trend, event, or uncertainty might reasonably be expected to materially impact [its] future revenues." *Id.* at *8.

Unlike here, the likelihood of harm in *Indiana Public Retirement System* was not merely potential — it was probable and, indeed, imminent. The joint government investigation signified that the company's overbilling practices would come to light, and because the company's customers were predominantly government agencies, the fallout from the investigations already underway was almost guaranteed to have a significant and adverse effect on the company's business. Here, for the reasons already stated, there is far less reason to believe that the July 16 Meeting "might reasonably be expected" to have a material effect on Alibaba's business, or even that the July 16 Meeting necessarily set off any same red flags at Alibaba. *See id.* Furthermore, Alibaba did disclose that increased and new laws might reasonably be expected to affect its operations. For instance, Alibaba disclosed that the new Administrative Measures "impose more stringent requirements and obligations on the online trading or service operators as well as the marketplace platform providers;" that the new measures require it to "adopt measures to ensure safe online transactions, protect consumers' rights and prevent trademark infringement;" and that the SAIC, and other regulators, "have in recent years strengthened enforcement actions,

31

including levying significant fines, with respect to cartel activity as well as abusive behavior of companies having market dominance." (Rosen Decl. Exh. C-3 at 26, 30, 48.)

Plaintiffs have not convinced the Court that Item 503 compels disclosure, either. Item 503 requires that Registration Statements and other filings "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c). "Although there is scant caselaw on Item 503," the inquiry can be boiled down to "whether the Offering Documents were accurate and sufficiently candid." *City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011) (quoting, in part, *Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 417 (S.D.N.Y. 2008)).

The Consolidated Complaint alleges that the Registration Statement failed to disclose, in violation of Item 503, that (1) the SAIC cracked down on the sale of defective and illegal goods on e-commerce sites like Alibaba's, (2) Alibaba lacked internal controls to ensure compliance with Chinese laws, and (3) Alibaba was notorious for being unresponsive to consumer and brand complaints and for selling defective and illegal goods.

Plaintiffs' argument regarding the SAIC crack-down is easily refuted. Alibaba's Registration Statement disclosed that "platform service providers may be jointly and severally liable with sellers and manufactures if they are aware or should be aware that the seller or manufacturer is using the online platform to infringe upon the lawful rights and interests of consumers and fail to take measures necessary to prevent or stop such activity" (Rosen Decl. Exh. C-3 at 29); that "Failure to comply with these consumer protection laws could subject us to administrative sanction" (*Id.*); that "two of the three PRC anti-monopoly enforcement agencies," including the SAIC, "have in recent years strengthened enforcement actions, including levying

32

significant fines, with respect to cartel activity as well as abusive behavior of companies having market dominance" (*Id.* at 48); and that as Alibaba "continue[s] to grow in scale and significance," it "expect[s] to face increased scrutiny, which will, at a minimum, result in our having to increase our investment in compliance and related capabilities and systems." (*Id.*) These disclosures render the Registration Statement "accurate and sufficiently candid" with regard to the SAIC's crackdown on violations of PRC Laws on e-commerce sites like Alibaba.

As for Plaintiffs' argument that Alibaba actually lacked internal controls to ensure compliance with Chinese laws and was unresponsive to consumer and brand complaints about defective and illegal goods, Plaintiffs' argument is essentially that Alibaba was obligated to admit that it was engaged in conduct that violated Chinese and American laws and regulations. But Plaintiffs have not alleged that Alibaba has ever been charged with such misconduct. Therefore, in light of Second Circuit case law declining to impose a duty to disclose uncharged criminal conduct under Item 503, Plaintiffs have failed to state a duty to disclose. *See In City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014).

Accordingly, Plaintiffs have not identified a regulation that requires disclosure of the July 16 Meeting and the receipt of Administrative Guidance.

    c. Seller of Stock

Plaintiffs also allege that "as sellers of stock in the Offerings, Alibaba, Ma and Tsai had a duty to disclose all material information." (Pls.' Br. at 23.) The federal securities laws do not impose any special duty on sellers of stock applicable here, above and beyond what has already been discussed. Thus, for the same reasons already articulated, Plaintiffs have not pleaded a duty to disclose the July 16 Meeting and Alibaba's receipt of Administrative Guidance.

### 2. Alleged Misrepresentations

In addition to alleging material omissions, Consolidated Complaint contains a laundry list of allegedly false or misleading statements made by Defendants in advance of and following the IPO. (*See* CC. ¶¶ 105-153, 178-189.) These statements can all be dealt with summarily.

The vast majority of the misstatements are allegedly false or misleading only because they are incomplete absent disclosure of the July 16 Meeting and Alibaba's receipt of Administrative Guidance. For the same reasons that these statements do not compel disclosure of the omissions, they are not materially misleading and actionable under Section 10(b).

The remainder of the misstatements are too general to be considered false or misleading under the Exchange Act. *See Ind. Pub. Ret. Sys.*, 2016 WL 1211858, at *29. This includes statements that:

- "Maintaining the trusted status of our ecosystem is critical to [Alibaba's] success." (CC ¶ 108.)

- "Alibaba's 'ability to maintain our position as a trusted platform for online and mobile commerce is based in large part upon: . . . the quality and breadth of products and services offered by sellers through our marketplaces; [and] the strength of our consumer protection measures.'" (*Id.* ¶ 110.)

- Alibaba "maintain[s] a 'no tolerance' policy with regard to counterfeit and fictitious activities on our marketplaces." (*Id.* ¶ 132.)

- That Alibaba is "making progress [with regard to counterfeit sales]. We are the doctors that are helping to cure the cancer. But the cancer is so aggressive. If you kill the doctor the cancer is still there." (*Id.* ¶ 178.)

- "Those who say the platform has lot of counterfeit goods, they must have no online shopping experience on Taobao at all." (*Id.* ¶ 184.)

- "In our years of combating [the problem of counterfeit goods], we have built cooperative relationships with various government bodies to combat counterfeiting at its source in order to safeguard the interests of consumers." (*Id.* ¶ 186.)

- "Alibaba Group takes the issue of [trademark] infringement very seriously and we are constantly working with partners and stakeholders to enhance [trademark] protection on our platforms in order to tackle the problem of counterfeiting effectively." (*Id.* ¶ 188.)

These are either statements about the company's ethical culture or reputation for integrity, which have been found to be "no more than 'puffery' [that] does not give rise to securities violations," or are so general that no reasonable investor would depend on them when deciding whether or not to invest in the company. *See ECA*, 553 F.3d at 206; *see also Ind. Pub. Ret. Sys.*, 2016 WL 1211858, at \*29-\*30.

Plaintiffs claim that these statements are nonetheless actionable because Defendants were aware of facts that rendered them materially false or misleading. However, "Plaintiffs' claim that these statements were knowingly and verifiably false when made does not cure their generality, which is what prevents them from rising to the level of materiality required to form the basis for assessing a potential investment." *Id.* at \*29 (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys.*, 752 F.3d at 183).

Accordingly, Plaintiffs have failed to allege the existence of a material misstatement under Section 10(b).

## B. The Consolidated Complaint Also Does Not Contain Particularized Allegations Giving Rise to a Strong Inference of Scienter

Plaintiffs' Section 10(b) claims fail for the additional reason that they have not pleaded facts giving rise to a strong inference that either the Individual Defendants or the Company acted with the requisite scienter.

To plead scienter under Section 10(b) and Rule 10b-5, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs,* 551 U.S. at 321. A complaint alleges scienter when "a reasonably person would deem the inference of scienter cogent and at least as compelling as any opposing inference

35

one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Courts must determine whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation meets that standard." *Id.* at 322-23.

"A strong inference of fraudulent intent may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *IKB Int'l S.A. v. Bank of Am. Corp.*, 584 Fed. Appx. 26, 27-28 (2d Cir. 2014). To plead scienter through motive and opportunity, Plaintiffs must allege that Defendants "benefitted in some concrete way and personal way from the purported fraud." *ECA Local*, 553 F.3d at 198 (quoting *Novak v. Kasaks*, 216 F. 300, 307-08 (2d Cir. 2000). However, "Motives that are common to most corporate offices, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive.'" *Id.* Motive is generally shown by alleging that corporate insiders sought to sell their own shares at an artificially inflated price. *Id.*

Allegations that a defendant conscious misbehavior or recklessness can also suffice, but where the defendants' motive to commit fraud is not apparent, "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). "Reckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996). "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements,"

because under such circumstances, "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)).

### 1. Motive and Opportunity

Plaintiffs first attempt to plead scienter by arguing that Defendants Ma, Tsai, and the Company had a motive to commit fraud, since they each benefited from an inflated value of Alibaba shares when selling stock and obtaining favorable rates in a bond offering.

Allegations of insider training only support an inference of scienter when the alleged trading is "unusual." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001). To determine whether the alleged trading is unusual, courts consider (i) the amount of profit from the sales, (ii) the portion of holdings sold, (iii) the change in volume of insider sales, and (iv) the number of insiders selling.

The trading here is certainly unusual. Plaintiffs alleges that Ma and Tsai received $867,000,000 and $289,000,000 in proceeds from the IPO, respectively — which are massive sums. (CC ¶¶ 28-29, 235.) These profits are substantial enough to suggest a motive to commit fraud.

Defendants are correct that Plaintiffs have not alleged many of the facts that courts often consider in deciding whether insider sales were unusual. Plaintiffs have not alleged that Ma's and Tsai's IPO sales represented a substantial portion of their overall holdings, or that any other insiders, including Individual Defendants Lu and Wu, sold shares before the corrective disclosure. [5] The Court also does not have the benefit of the Individual Defendants' trading

---

[5] According to Defendants, Ma and Tsai's sales represented 6.19% and 5.09% of their respective

histories to help it determine whether the amount and the timing of Ma and Tsai's sales were particularly suspicious. This of course tempers any strong inference of scienter that can be raised based on Ma's and Tsai's insider sales alone. *See, e.g., Acito*, 47 F.3d at 54. However, the sheer size and dollar amount of the insider sales tips the scales toward an inference of scienter at the motion to dismiss stage.

With respect to the Company, it is well established that a corporation's desire to raise funds through an IPO and to obtain favorable pricing for a bond offering do not give rise to a strong inference of scienter.[6] *See, e.g., San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.,* 75 F.3d 801, 814 (2d Cir. 1996). Plaintiffs cannot establish motive by alleging "goals that are possessed by virtually all corporate insiders." *South Cherry Street, LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 110 (2d Cir. 2009) (quotations omitted). Without more, Plaintiffs cannot established that the Company had motive and opportunity to commit fraud, apart from relying on Ma's and Tsai's individual motives. Nothing more is pleaded in the Consolidated Complaint.

## 2. Conscious Misbehavior or Recklessness

Plaintiffs next attempt to plead scienter by arguing that Defendants knowingly or recklessly made material misstatements in, and omitted material information from, the Registration Statement. Plaintiffs rely, in part, on boilerplate allegations about the Individual Defendants' corporate positions, which amount to little more than an attempt to plead "collective

---

Alibaba holdings. (*See* Reply Br. at 15; Registration Statement at 250.) This Circuit tends to find insider sales suspicious only when the sales represented a larger percentage of an insider's holdings. *See, e.g., Acito*, 47 F.3d at 54 (no scienter where insider sold 11% of his holdings).
[6] Plaintiffs allege that Alibaba received $10 billion from the IPO and an additional $8 billion through the sale of senior unsecured notes at a favorable rates on November 21, 2014. (*Id.* ¶¶ 235-37.)

scienter." These allegations are "patently insufficient" to plead scienter in this Circuit. *See, e.g., Take-Two*, 551 F. Supp. 2d at 274.

Plaintiffs' argue that it "defies logic to believe that the Individual Defendants were not aware of the July Meeting and the harsh Administrative Guidance issued by the SAIC," even though none of the Individual Defendants attended the July 16 Meeting and accepted the Administrative Guidance.[7] (Pls.' Br. at 30.) In particular, Plaintiffs argue that Ma "was a principal shareholder and he possessed and exercised utmost control over the Company" and that the Business Unit Heads who attended the July 16 Meeting reported directly the Individual Defendants Lu and Wu.

Plaintiffs miss the point. "[A] failure to disclose particular information, by itself, can only constitute recklessness if there was an obvious duty to disclose that information." *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 446 (S.D.N.Y. 2006). In other words, it is not enough to establish that Defendants were aware of the July 16 Meeting and the receipt of Administrative Guidance if it was not also obvious that such information needed to be disclosed in the Registration Statement. As previously discussed, Plaintiffs have not established a duty to disclose, let alone an obvious duty to the Individual Defendants. Because "the duty to disclose . . . was not so clear" Defendants' "recklessness cannot be inferred from the failure to disclose." *Kaltnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001).

Plaintiffs' remaining attempts to establish conscious misbehavior or recklessness — an inference based on the core operations doctrine and the Individual Defendants' signatures on

---

[7] Plaintiffs argue, correctly, that they may plead a strong inference of scienter against the Company without doing so against any of the Individual Defendant. *See Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). (*See* Pls.' Br. at 28-29.)

SEC filings — do nothing to strengthen its case. Under the core operations doctrine, a party can establish scienter where "a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent." *See Shemian v. Research In Motion Ltd.*, No. 11 CIV. 4068 RJS, 2013 WL 1285779, at \*17 (S.D.N.Y. Mar. 29, 2013). As discussed, Plaintiffs have not established that the July 16 Meeting or the receipt of the Administrative Guidance so obviously triggered a need to disclose that it must have been apparent to Defendants that the Registration Statement was false or misleading.

Finally, the Individual Defendants' signatures on SEC filings contribute, at most, a weak inference of scienter. As courts have acknowledged, "To hold otherwise would allow plaintiffs to plead the scienter of whole classes of defendants solely by alleging a misstatement." *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 485 (S.D.N.Y. 2006).

Even when considered collectively with Ma's and Tsai's possible motives to commit fraud, these allegations fall short of what is required to plead scienter under the PSLRA. While Plaintiffs have alleged some facts that would suggest a motive to commit fraud on the part of Ma and Tsai (but not the Company), the allegations in the Consolidated Complaint, considered holistically, do not support a strong inference that any of the Defendants acted with scienter.

**III.     Plaintiffs Fail to State a Claim Under Section 20(a)**

Section 20(a) holds liable any persons who "control" those found primarily liable under the Exchange Act. *Greebel v. FTP Software, Inc.*, 194 F.3d at 185, 207 (1st Cir. 1999). Here, the Consolidated Complaint fails to allege an underlying violation of the securities laws. Accordingly, Plaintiffs' Section 20(a) claims must also be dismissed. *Id.*

**IV.     Leave to Amend**

Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend a complaint shall be "freely" given when "justice so requires," although "a district court has discretion to deny

leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the

opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

Granting leave to amend is "futile" if a revised claim still "could not withstand a motion to

dismiss pursuant to Rule 12(b)(6)." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*,

282 F.3d 83, 88 (2d Cir. 2002).

Here, the problems with Plaintiffs' claims are "substantive" rather than the result of an

"inadequately or inartfully pleaded" complaint. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d

Cir. 2000). I have concluded that Defendants were under no duty to disclose the July 16 Meeting

and the receipt of the administrative guidance, because the July 16 Meeting cannot be construed

as anything more than an informal meeting with regulators. The failure to disclose that meeting

and what happened at the meeting is the linchpin of this case. Therefore, an amended complaint

would not survive a motion to dismiss, and giving Plaintiffs an opportunity to replead would be

"futile" under Second Circuit law and "should be denied." *Id.*; *see also Panther Partners Inc. v.*

*Ikanos Commc'ns, Inc.*, 347 Fed. Appx. 617, 622 (2d Cir. 2009) (summary order) ("Granting

leave to amend is futile if it appears that plaintiff cannot address the deficiencies identified by the

court and allege facts sufficient to support the claim.").

41

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted in full. The Clerk of the Court is directed to remove Docket No. 16 from the Court's list of pending motions and to close the file.

Dated: June 24, 2016

Ciller M. Mal

_____

U.S.D.J.

BY ECF TO ALL COUNSEL